**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Ivan Mendivil, a married man )
Plaintiff, )
vs. )
United States of America; United States Department of Army, )
Defendants. )

No. CIV 06-2651 PHX RCB

O R D E R

***Introduction***

Plaintiff Ivan Mendivil, while working as a gunner at the United States Army Yuma Proving Ground, lost three fingers when the clip on the mortar which he was firing allegedly "slipped off the appendage and fired prematurely[.]" Co. (doc. 1) at 3, ¶ 8. Plaintiff is bringing this negligence action against the United States and the United States Department of the Army ("the government") pursuant to the Federal Tort Claims Act ("FTCA"). Currently pending before the court is the government's motion to

dismiss for lack of subject matter jurisdiction[1] on the basis of the discretionary function exception to the FTCA, and for summary judgment (doc. 53).[2]

***Background***[3]

In February 19, 2004,[4] plaintiff was working as a civil contract employee of EC III, Inc. at the Yuma Proving Ground ("YPG"), a United States Army test facility. Mot. (doc. 53) at 3, ¶ 1 (citation omitted). He and Army civilian personnel were testing a radar system. Id. at 3, ¶ 2. As part of that process, "[m]ortar rounds are fired to test the ability of the radar to track the location of the mortar tube." Id. at 3, ¶ 2:6-7 (citations omitted). Plaintiff was working as a gunner on the mortar crew, loading and firing the mortar. Id. at 3, ¶ 3:10 and 12 (citation omitted). His mortar crew leader was an Army civilian employee, Donald Dyer. Id. at 3, ¶ 3:11-12.

In listing the "Government and Contractor Support Personnel

---

[1] The United States cites to "Federal Rule of *Criminal* Procedure 12(b)(1) and (6)" as the basis for its motion to dismiss for lack of subject matter jurisdiction. Mot. (doc. 53) at 1:18-19 (emphasis added). This is an obvious misstatement given that this is a civil action. Regardless, the "applicability of the discretionary function exception may be determinable upon a motion to dismiss or for summary judgment." Hazelwood v. United States, 2006 WL 1599344, at *2 (D.Ariz. June 5, 2006) (internal quotation marks and citations omitted). Given the parties' heavy reliance upon matters beyond the complaint, and the fact that the United States also relies upon Rule 56 in bringing this motion, the court will treat this motion as one for summary judgment under that Rule.

[2] Plaintiff requests oral argument, but the United States did not. The court denies this request because the issues have been fully briefed and oral argument will not aid its decisional process. See Fed. R. Civ. P. 78; Lake at Las Vegas Investors Group, Inc. v. Pac. Dev. Malibu Corp., 933 F.2d 724, 729 (9th Cir. 1991); Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

[3] Unless otherwise indicated, these facts are undisputed.

[4] The complaint seems to conflict as to the date of injury. At one point it alleges that "[p]laintiff was injured on February 19, 2004[,]" but in another paragraph it alleges that "mortars were being fired as part of a test of a radar system[] . . . [o]n February 10, 2004[.]" Co. (doc. 1) at 2, ¶¶ 4:4 and 6:14.

Supervisor's Responsibilities," the Yuma Test Center Standard Operating Procedures for Range Operations ("SOPs") states, among other things:

> The supervisor of each support section assigned to a test shall ensure that personnel: . . .
>
> > Know that they may question and request from the TD clarification of any procedure suspected to be hazardous or unsafe.

Id., exh. F thereto at 10-11, ¶ 2-7(d). Consistent with that SOP, the YPG Acting Chief of the Munitions and Weapons Division, Larry Bracamonte, testified that if a person "feels the procedure is unsafe, he has the authorization to stop the test[.]" Id. at ¶ 5, and exh. A thereto at 71:9-10. "Assuming" on the day of the incident, "an EC III employee[] . . . thought the wrong clip was being used[,]" Mr. Bracamonte further testified that "[t]hey should stop the operation at that time, . . . and contact the supervision [sic] for guidance." Id., exh. A thereto at 71:14-22. Donald Dyer testified similarly. Mr. Dyer was asked, "If someone sees something that they feel is unsafe on the range, what can they do to stop it?" Id., exh. C thereto at 61:21-22. He responded, "First of all[,]" they "bring it to the . . . Test Director's Attention[.]" Id., exh. C thereto at 61:23-24. If the Test Director "feels it's unsafe, they'll stop the test and then they'll investigate it[.]" Id., exh. C thereto at 61:24-25. But here, "[n]either Plaintiff nor anyone else on the mortar crew requested a halt in the test firing on the day of Plaintiff's injury." Id. at 3, ¶ 5.

It is undisputed that "[t]his incident involved the use of a 'fuze clip' to suspend the tip of a mortar round (cartridge) at the

top of the mortar tube (cannon)." Id. at 3, ¶ 6. "A lanyard is attached to the clip and is then pulled to drop the round down the tube after all test personnel are moved a safe distance away to a shelter called a 'bombproof.'" Id. at 3-4, ¶ 6 (citations omitted). "Generally, there is a specific type of clip for use on each mortar round fuze type[,]" as evidenced by the "Mortar Fuze Clip/Body Clip Identification Chart [("clip chart")]," which is part of the SOPs. Id. at 4, ¶ 7 (citing exh. G thereto, App. H).

But, on the day of the incident, "[t]he mortar round being fired . . . was an M374A3 cartridge (which has an M567 PD fuze)." Id., at 4, ¶ 8. That particular mortar round was not on the identification chart. Id. (citation omitted). What is more, the M374A3 cartridge "will accept either the B-clip or the C-clip." Id. at 4, ¶ 8. "If a mortar round will accept either fuze clip, the gun crew has the discretion to decide which one to use." Id. at 5, ¶ 11 (citing, *inter alia*, exh. B thereto at 99:1-24). Plaintiff did controvert three of the United States' factual statements, PSOF (doc. 59) at 1:19-23, but this is not one.[5]

Somewhat surprisingly, the parties' respective statements of facts did not explain how the accident occurred. So, the court is resorting to the complaint. It stresses, however, that these allegations are not dispositive of the present motion and are provided for background purposes only.

Evidently, after the testing was done for the day "a few

---

[5] Even the three facts which plaintiff did controvert, he did not do so in conformity with LRCiv 56.1(b). Plaintiff simply indicated that he was "controvert[ing] the following fact as stated by Defendant[.]" PSOF (doc. 59) at 1. He then listed numbers "9, 10, [and] 14[.]" Id. He did not, as that Rule requires, "set forth . . . a reference to the specific admissible portion of the record supporting [his] position[.]" See LRCiv 56.1(b).

mortar rounds remained." Co. (doc. 1) at 2, ¶ 7. A decision was made to fire those remaining rounds. Instead of using the clip which they had been using all day, the gunners switched to another clip. Plaintiff alleges that this replacement clip "was inherently unstable," and that he was injured when "the round slipped off the appendage and fired prematurely[.]" Id. at 3, ¶ 7.

After exhausting his administrative remedies, plaintiff commenced the present action. Plaintiff alleges that the United States was negligent in two ways: first, in "permitting testing to continue with the use of the replacement [*i.e.* the B-clip instead of the C-clip][.]" Co. (doc. 1) at 3, ¶ 10, and second, "in violating its own standing operating procedures [("SOPs")] for ground weapons firing." Id. Plaintiff makes a related allegation that the SOPs "were incomplete and inadequate with respect to firing 81 mm. mortar rounds." Id. Relying upon the discretionary function exception to the FTCA, as noted at the outset, the United States asserts that subject matter jurisdiction is lacking here. Thus, it asserts, it is entitled to summary judgment on plaintiffs' claims.

## ***Discussion***

### ***I. Governing Legal Standards***

Citing to two cases outside this Circuit, the United States asserts that "plaintiff bears the burden of showing that the discretionary function exception . . . does not apply here. Mot. (Doc. 53) at 8:21-23 (citations omitted). The United States has it exactly backwards, at least in the Ninth Circuit. See St. Tammany Parish v. Federal Emergency Management Agency, 556 F.3d 307, 315 n. 3 (5th Cir. 2009) (citing cases) (recognizing "sister courts of

appeal are split" on "whether the plaintiff or the government bears the burden of proof to show whether a discretionary function exception . . . applies[]"). "While the [plaintiff] bear[s] the initial burden of proving subject matter jurisdiction under the FTCA, the *United States bears the ultimate burden* of proving the applicability of the discretionary function exception." Welsh v. U.S. Army, 2009 WL 250275, at *2 (N.D.Cal. Feb. 3, 2009) (citing Terbush, 516 F.3d at 1128) (emphasis added). Not only that, "[t]he [United States'] failure to satisfy either the first or second part 'of the two-part discretionary function test' defeats application of that exception." Casillas v. U.S., 2009 WL 735193, at *11 (D.Ariz.) (citing Sabow v. U.S., 93 F.3d 1445, 1454 n. 10 (9th Cir. 1996)), Casillas v. U.S., adopted by 2009 WL 735188 (D.Ariz. Mar. 19, 2009). On the other hand, "[i]f the federal defendant meets the burden of proving that the discretionary function exception applies, then the federal courts lack subject matter jurisdiction to hear plaintiffs' claim." Welsh, 2009 WL 250275, at *2 (citing GATZ/Airlog Co. v. United States, 286 F.3d 1168, 1174 (9th Cir. 2002)).

"To meet this burden in the context of a summary judgment motion, [the United States] must 'adduce[] sufficient evidence to establish that no genuine issues of material fact remain for trial with respect to the discretionary function exception.'" Hazelwood, 2006 WL 1599344, at *2 (quoting Prescott v. United States, 973 F.2d 696, 701 (9th Cir. 1992)). The fact that the issue is the applicability of the discretionary function exception does not change the fundamental rule that on a motion for summary judgment, the court must view the pleadings and supporting documents in the

light most favorable to the non-moving party. Fed. R. Civ. P. 56(c). With these standards firmly in mind, the court will consider the parties' respective discretionary function exception arguments.

***II. Discretionary Function Exception***

"The FTCA waives the government's sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of their employment." Terbush v. United States, 516 F.3d 1125, 1128 (9th Cir. 2008). The FTCA expressly provides that the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). There are "a number of waivers to this broad waiver of sovereign immunity[.]" Terbush, 516 F.3d at 1129. The exception which the United States invokes herein is "the oft litigated 'discretionary function exception[.]'" See id. The purpose of this exception, is "to insulate certain governmental decision-making from 'judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" Id. (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 81 l.Ed.2d 660 (1984)).

As the Supreme Court set forth in Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the applicability of the discretionary function exception is governed by a two-step analysis. First, the court must "determine whether the challenged actions involve an 'element of judgment or choice."

Terbush, 516 F.3d at 1129 (quoting United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). Under this inquiry, the focus is on the "nature of the conduct, rather than the status of the actor[.]" Gaubert, 499 U.S. at 322, 111 S.Ct. at 1267). Therefore, "the discretionary element is not met where a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" Terbush, 516 F.3d at 1129 (quoting Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954). "If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'" Id. (quoting Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954). Succinctly put, "[w]ithout choice, there can be no discretion." Miller v. United States, 163 F.3d 591, 594 (9th Cir. 1998). On the other hand, when "a specific course of action is not prescribed, . . . an element of choice or judgment is likely involved in the decision or action." Terbush, 516 F.3d at 1129.

If the United States meets the first part of the Berkovitz test, the court must consider "'whether that judgment is of the kind that the discretionary function exception was designed to shield,' namely, 'only governmental actions based on considerations of public policy.'" Id. at 1129 (quoting Berkovitz, 486 U.S. at 536-37, 108 S.Ct. 1954). "Public policy . . . include[s] decisions 'grounded in social, economic, or political policy.'" Id. (quoting Varig, 467 U.S. at 814, 104 S.Ct. 2755). As the United States is quick to point out here, "[e]ven if the decision is an abuse of the discretion granted, the exception will apply." See id. (citing, *inter alia*, 28 U.S.C. § 2680(a)).

***A. "Element of Judgment or Choice"***

Bypassing the element of judgment or choice, initially the United States addressed only the second Berkovitz step - policy considerations. Confronting this choice element head-on, however, plaintiffs assert that the SOPs "mandated policies and procedures for weapons testing." Resp. (Doc. 6) at 6:4. Thus, plaintiff reasons that the United States cannot satisfy the first element of the discretionary function exception to the FTCA.

The United States first faults plaintiff for not "identify[ing] with specificity" the purportedly mandatory SOPs which he claims were violated. Reply (doc. 64) at 7:3-4 (citations omitted). Plaintiff's lack of specificity did make review of the detailed SOPs record more difficult. It is not a sufficient basis, as the United States puts it, however, to "defeat the first part of the [Berkovitz] test." Id. at 7:7 (citations omitted). This is especially so given that the burden of proof is on the United States - not on the plaintiff.

Moreover, the procedural posture of the cases upon which the United States relies to support this argument is different than the procedural posture of this action. The courts in both ALX El Dorado, Inc. v. Sw. Sav. & Loan Ass'n/FSLIC, 36 F.3d 409 (5th Cir. 1994), and Johnson v. United States, 47 F.Supp.2d 1075 (S.D.Ind. 1999), were faced with Rule 12(b) motions to dismiss. Necessarily then, they were examining only the sufficiency of the allegations in the complaint. Accordingly, in ALX El Dorado, the Fifth Circuit held that plaintiffs' averments of "only some generalized failures to follow mandatory rules" were "insufficient, *in themselves*, to defeat the first part of the [Berkovitz] test." ALX El Dorado, 36

F.3d at 411-412 (footnote omitted) (emphasis added). The Fifth Circuit did not affirm dismissal on that basis alone, however. It also addressed the second Berkovitz step, finding the complaint equally deficient in that regard.

Similarly, the Johnson court was examining the sufficiency of complaint under Rule 12(b)(1). The complaint there only "generally alluded to the Marshals' Policy Manual and vaguely suggest[ed] that the actions taken by the Marshals . . . were contrary to an enumerated policy." Johnson, 47 F.Supp.2d at 1080 n. 3. "[W]ithout connecting the particular actions of the Marshals with a policy from the Manual," the court held that "the vacillatory roamings of Plaintiffs' conjecture will not save this part of their claim from dismissal." Id. The court further observed that the policy manual had not been submitted to the court and thus could not be considered. Not only that, in contrast to plaintiff Mendivil, the Johnsons did not respond at all "to the substance of the [United States] motion" to dismiss. Id. at 1079.

In the present case, however, the discretionary function exception arises in the broader procedural context of a summary judgment motion. Therefore, the court is looking beyond the allegations in the complaint. And, unlike Johnson, the SOPs upon which plaintiff is relying to show a mandatory duty are before the court. Further, plaintiff does reference two specific SOPs in his response. Thus, plaintiff has gone beyond the "vague suggestions" and "conjecture" which the Johnson court found were insufficient to overcome the discretionary function exception. Preferring to reach the merits, and given that El Dorado and Johnson are distinguishable, the court will not, despite the United States'

urging, grant this motion due to a lack of specificity by plaintiff in identifying the source of the claimed mandatory duty.

Focusing on the element of choice, in its statement of facts the United States declares, "[*i*]*f a mortar round will accept either fuze clip*, the *gun crew has* the *discretion* to decide which one to use." Mot. (doc. 53) at 5, ¶ 11 (emphasis added). Based upon photographs of the M374A3 cartridge and fuze in the record, the United States further declares that the M374A3 cartridge and fuze, which plaintiff was using at the time of the accident, "will accept either the B-clip or the C-clip." Id. at 4, ¶ 8 (citation omitted). Plaintiff did not controvert these statements. Thus, in accordance with LRCiv 56.1(b), they are deemed admitted.

The record supports these statements. During his deposition, Wayne Schilders, Chief Weapons Operation Division, agreed that "if . . . a B clip was routinely sticking, . . . it would have been within [the mortar crew leader's] discretion to use a C clip[.]" Id., exh. B thereto at 99:2-9. Mr. Schilders further explained, if there is "a clip that works [and] everything is the same," then "part of the leeway given the gun crew leader," such as Mr. Dyer, is to "use whichever one [clip] is going to work for the day." Id., exh. B thereto at 99:15-19. If the M374A3 cartridge and fuze had been listed in the clip chart, then perhaps use of a certain clip with this cartridge would be required. See Mot. (doc. 53), exh. G thereto at 74. The fact remains, though, that the M374A3 cartridge is not among the cartridge combinations which that chart lists.

To defeat summary judgment, plaintiff, as the non-moving party, has the burden of showing a genuine issue of material fact

as to whether the United States had discretion here. As just explained, plaintiff did not meet that burden.

Plaintiff cannot overcome that burden by relying upon "mandatory" duties which purportedly the SOPs create. First, as the United States points out, the only two SOPs from which plaintiff quotes (SOP ch. 1 §§ 1-1(a) and 1-2(a)) "are broad, general statements of purpose and scope." Id. at 8:18. Not only that, plaintiff selectively quotes from section 1-1. It is self-evident that that section entitled "Purpose and Scope" does not place any kind of mandatory duty on the United States. This reading of section 1-1(a) is reenforced when a sentence which plaintiff did not quote is taken into account. That sentence states, "This [SOP] prescribes *general range control precautions*, instructions, and danger zones necessary in all types of test operations . . . within the [YPG]." PSOF (doc. 59), exh. 1 thereto at 1, § 1-1(a) (emphasis added). There is nothing in those "[g]eneral" statements and statements of "[p]urpose and [s]cope" though, "compell[ing][,]" as plaintiff puts it, the "use of . . . various components involved." See Resp. (doc. 60) at 7:1-2.

Plaintiff also is relying upon the following SOP: "This SOP provides the necessary information for establishing a surface danger zone and airspace danger zone data required for the safe testing of weapon systems, munitions, and explosive devices described herein." Id., exh. 1 thereto at 1, § 1-2(a). Clearly this broad "General" statement does not impose any type of mandatory duty. Moreover, as the United States is quick to point out, the SOPs are prefaced by a boldfaced "**NOTE**" explicitly declaring: "Persons performing hazardous operations on YPG are

advised that the *guidance* provided herein is not intended to be complete itself." Id., exh. 1 thereto at 1 (emphasis added). This language suggests an element of discretion.

Plaintiff's reliance upon the SOPs is further undermined by the fact that two of them are inapplicable. Plaintiff states that section 6-1 "mandates that when a weapon or component of a weapon is determined to be unsafe, the weapon or component will be condemned." Resp. (doc. 60) at 6. Under the express terms of that section a "weapon or component will be condemned[]" only "[w]hen inspection . . . determines that the weapon or component is unsafe for firing[.]" No such inspection occurred here. Condemnation simply is not an issue.

Based upon SOP § 10-1, plaintiff states that "[n]o employee has the discretion to modify ammunition or a component at the gun position." PSOF (doc. 59) at 2, ¶ 5 (citation omitted). That SOP actually states: "No ammunition item or component will be disassembled or modified on a range or at a gun position without an approved hazard analysis and specific detail SOP prepared for that purpose." PSOF (doc. 59), exh. A thereto at 47, § 10-1(d)(2). In any event, where, as here, one of two fuze clips may be used on a cartridge, the use of one as opposed to the other is not a modification. Thus, plaintiff's reliance upon this SOP to support a mandatory duty is unavailing.

In addition to the foregoing, plaintiff mentions three other SOPs as the source of a purported mandatory duty. None of those SOPs establish such a duty though. Looking to Chapter 2-6, setting forth "Test Director's Responsibilities," plaintiff claims that YPG employees do not have discretion in "weapons firing procedures"

because those SOPs "provide[] that . . . appropriate safety procedures must be implemented and followed[.]" Resp. (Doc. 60) at 6 (citation omitted). A similar lack of discretion can be found, according to plaintiff, because the SOPs "require[] that the equipment utilized must be safe[.]" Id. (citation omitted). What that SOP actually states, is that one of the Test Director's responsibilities is to "[c]onduct tests with personnel, materiel, and equipment considered safe." PSOF (doc. 59), exh. 1 thereto at 94, § 2-6(j). That section goes on to state that "Test Directors are vested with authority to issue orders to correct conditions deemed to be hazardous or potentially hazardous[]" – a fact plaintiff seemingly disregards. See id. This grants Test Directors with some element of discretion. These broad, generic safety statements do not, in this court's view, support plaintiff's view that YPG employees "had no discretion in weapons firing procedures[,]" particularly with respect to which clip to use on the M374A3 cartridge. See Resp. (doc. 60) at 1 (emphasis omitted).

Finally, in his statement of facts, plaintiff claims that "Gun Crews were mandated to use only fuze clips provided." PSOF (doc. 59) at 2, ¶ 7 (citation omitted). To support this assertion, plaintiff cites to SOP § 9-1 ("Bates #49"), "Pre-Fire Operations[,]" setting forth who is "responsible" for which "action" under those conditions. There is nothing in this SOP to support plaintiff's assertion, however. The only potential relevant statement on the page to which plaintiff cites indicates that the "gun crew" is "responsible" to "[v]erify that [they] have the proper fuze clip(s) or body clip(s) required for firing operation." Id., exh. 7 thereto at 49. Reference is then made to

the clip chart which, as previously stated, does not include the M374A3 cartridge which plaintiff was using at the time of the accident. Having responsibility for verifying that one has the proper fuze or body clip does not equate to a mandatory duty to "use only fuze clips provided[,]" as plaintiff claims.

Whether viewed individually or collectively, the SOPs to which plaintiff refers are not sufficient to establish a mandatory duty on the part of the United States. Nor are they sufficient to defeat the United States showing that it had discretion for mandating weapons procedures. In this case, that discretion took the form of the type of clip (B or C) which could be used on the M374A3 cartridge. The United States cannot be deemed to have violated a mandatory policy because no SOP - plaintiff's only source of this purported duty - requires that a certain type of fuze clip be used with this particular cartridge. In short, none of the SOPs which plaintiff mentions "specifically require [the United States] to act in the ways plaintiff[] identif[ies]." See Jasso v. U.S. Dept. of Agriculture Forest Service, 2008 WL 3863503, at *5 (E.D.Cal. Aug. 18, 2008). Thus, as the Ninth Circuit did in Terbush, the court "agree[s] . . . that absent a mandatory and specific policy dictating otherwise, [it] is left to assume that [the challenged action] [wa]s a discretionary function." See Terbush, 516 F.3d at 1133. Even without the benefit of that assumption, as explained above, the United States has met its burden of showing that it had an element of choice here.

***B. Public Policy Considerations***

The court must next consider whether the United States has met its burden of showing that its conduct was grounded in public policy

considerations. The United States first baldly asserts that "[t]he decision at issue here is a technical one that is ill-suited to judicial second-guessing." Mot. (doc. 53) at 10. Additionally, from the United States' standpoint, "the decision to use remote firing, and therefore u[s]e some form of clip or other device to suspend the mortar" was "grounded in safety conditions." Reply (doc. 64) at 9.

Relying upon two Ninth Circuit cases which will be discussed momentarily, plaintiff counters that "there was no policy judgment to be made" here because the use of "an unreasonably dangerous fuze clip was a failure to enforce a policy choice already made." Resp. (Doc. 60) at 7. Therefore, that choice does not fall within the discretionary function exception. Second, plaintiff claims that the United States' conduct was "rooted in technical standards[.]" Id. at 9. Plaintiff thus implies that the technical nature of the challenged decision means that it did not implicate public policy considerations.

The United States has the stronger argument here. To be sure, the Ninth Circuit, has "held that a failure to effectuate policy choices already made' will not be protected under the discretionary function exception." Marlys Bear Medicine v. United States, 241 F.3d 1208, 1215 (9th Cir. 2001) (citing Camozzi v. Roland/Miller and Hope Consulting Group, 866 F.2d 287, 290 (9th Cir. 1989)). Plaintiff cannot avail himself of this line of cases, however, because they are distinguishable. The Court in Camozzi held that "where the U.S. Postal Service ("USPS") retained safety oversight over a construction project, the failure of the USPS or its representative to require floor coverings was held to be a 'failure

to effectuate policy choices already made,' not the result of a policy decision and therefore subject to FTCA liability." Id. (citing Camozzi, 866 F.2d at 290). In contrast to Camozzi, plaintiff has not shown that the United States retained safety oversight functions and that that retention was "incorporated in the contracts." See Camozzi, 866 F.2d at 287. For much the same reason, Bear Medicine also is distinguishable in that it involved a contractual requirement that the Bureau of Indian Affairs ensure that logging operations complied with OSHA and other internal regulations.

In the present case, there is no evidence that the United States established a specific policy governing the type of fuze clips to be used on a M374A3 cartridge Nor, as in Bear Medicine and Camozzi, was the United States under any contractual obligation with respect to safety oversight. In fact, the contract between the United States and plaintiff's employer, EC III, mandated that EC III personnel, such as plaintiff, "'shall not be placed in a position where they are . . . under the supervision, [or] direction . . . of a Federal Officer, Military or Civilian.'" Mot. (doc. 52) at 3, ¶ 4 (quoting exh. H thereto at H-2, ¶ H.4(b)(1)). Although not determinative of the safety oversight function, this clause seriously undermines any argument that the United States expressly retained that function.

Despite what plaintiff Mendivil implies, the Ninth Circuit has not "adopted a blanket rule that all claims regarding the implementation of a chosen course of action are not protected" under the discretionary function exception. See Cleveland v. U.S., 546 F.Supp.2d 732, 765 (N.D.Cal. 2008). "The cases on which plaintiff[]

relies concern government activity involving safety considerations under *established policies* – which is not the case here." Id.

Moreover, "[w]hen established governmental policy, as expressed or implied by . . . agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324, 111 S.Ct. 1267. This presumption alone will not carry the day for the United States though. The court must also "focus . . . 'on the nature of the actions taken and on whether they are *susceptible* to policy analysis.'" Terbush, 516 F.3d at 1133 (quoting Gaubert, 499 U.S. at 325, 111 S.Ct. 1267). As will be seen, the decision to engage in remote firing, which necessarily involves the use of fuze clips, is susceptible to policy analysis. It does not matter whether there is "actual evidence of policy-weighing in any given decision," so long as there is "some support in the record that the decisions are 'susceptible' to policy analysis[.]" Id. at 1134. The United States has the burden of proof on this issue, which it has met. See id.

Plaintiff Mendivil also does not controvert the fact that "out of safety concerns[,]" the United States "had rejected the 'man-firing' technique utilized by the military in favor of the 'remote firing' using the fuze clips and lanyards[.]" Mot. (doc. 53) at 5, ¶ 12. Mr. Bracamonte explained that "manned firing" had "been discussed before in the past[,]" but it is not done because "you are physically putting a person next to the mortar[.]" Mot. (doc. 53), exh. A thereto at 59:18-25. That is avoided by placing the clip on the muzzle. See id. Plaintiff also did not controvert the United States' paraphrasing of Mr. Schilders' testimony on that point. In

particular, as the United States indicates, "[h]e testified that the use of fuze clips had their origin with safety concerns going back 40 to 60 years when it was thought prudent not to be next to the mortar tube when testing prototype ammunition whose actual characteristics were not known." Id. at 5, ¶ 13 (citing exh. B thereto at 30:25 - 32:1.

The decision to use remote firing (and hence fuze clips), as opposed to manned firing, when conducting military weapons tests, is akin to Miller v. United States, 163 F.3d 591, 595-96 (9th Cir. 1998), where firefighters need to consider public safety and their own safety in battling forest fire cases, and to Alfrey v. United States, 276 F.3d 557, 565 (9th Cir. 2002), where prison guards must balance prisoner safety with their own safety in searching cells in response to a reported threat. "[U]nite[d]" by "safety considerations[,]" those Courts held that the challenged decisions were susceptible to policy analysis grounded in social, economic or political concerns. See Terbush, 516 F.3d at 1133. Thus, the Miller and Alfrey Courts held that the discretionary function exception to the FTCA barred plaintiffs' claims therein. The same is true here. The United States' decision is certainly "susceptible to policy analysis" and involves the kind of judgment which the discretionary function was designed to shield. As the United States persuasively stated, "[t]he military cannot be told that they have the discretion to test weapons systems[,] but then that they do [not] have the discretion to determine how to do so." Mot. (doc. 53) at 11:21-22.

For all of these reasons, the court finds that the United States has met its burden of proving that the discretionary function

exception, 28 U.S.C. § 2680(a), to the FTCA applies here. Thus, the court lacks subject matter jurisdiction and grants the United States' motion for summary judgment on that basis. Consequently, there is no need to, and indeed in the absence of subject matter jurisdiction the court cannot, address the parties' remaining arguments.

To conclude, IT IS ORDERED that the "Defendant[s'] Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Summary Judgment (doc. 53) is GRANTED. The Clerk of the Court is directed to enter judgment in favor of defendants and to terminate the case.

DATED this 31st day of March, 2009.

Robert C. Broomfield
Senior United States District Judge

Copies to counsel of record